**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

Toni P. Walker, et al.,

Plaintiffs,

v. Case No. 1:23-cv-2827-MLB

James Eric Ragazino, et al.,

Defendants.

______________________________/

**OPINION & ORDER**

Anthony Lamar Walker ("Lamar") died of hypothermia while incarcerated at the DeKalb County Jail. His parents—Toni and Anthony Walker—sue Defendants for causing their son's death. (Dkt. 195.) Defendants move to dismiss. (Dkts. 198, 199, 200.)

## I. Background

Defendant DeKalb County Sheriff Melody Maddox operates the jail. (Dkt. 195 ¶ 44.) She contracted with Defendant Centurion Detention Health Services to provide inmates mental health care. (*Id.* ¶ 54.) The contract required Centurion to maintain staffing levels at the jail, including by providing a psychiatrist or psychologist to make daily

rounds and enter progress notes on inmates. (*Id.* ¶¶ 55–59.) Centurion agreed to pay liquidated damages if it failed to do so. (*Id.*)

Lamar was detained in the jail in December 2022. (*Id.* ¶¶ 77–78.) At the time, he suffered from mental health problems, including schizophrenia. (*Id.*) Since he had been detained there before, jail staff and medical providers knew about his mental health issues. (*Id.* ¶¶ 78, 80.) Medical staff designated him to cell 18 on block 3A (the mental health unit) and noted the need for mental health treatment. (*Id.* ¶ 82.) Staff later moved Lamar to cell 10, a cell located at the end of block 3A. (*Id.* ¶¶ 83, 126.) Cell 10 had cement floors, a cement bed, no working light, no working call button, inadequate heating, and holes in the ceiling. (*Id.* ¶¶ 97, 107.) It had no blanket, bedding, or source of warmth. (*Id.* ¶ 202.)

Defendants Dr. James Ragazino and Dr. Delquis Mendoza ("Centurion Psychiatric Defendants") were the jail psychiatrists who observed Lamar when he entered the jail. (*Id.* ¶¶ 81, 83, 86.) They approved a care plan for Lamar that included mental health "observation," saying they would "monitor per protocol and restrict all

materials that may cause self-harm[.]" (*Id.* ¶ 84.)[1] Ragazino made a note in Lamar's medical records that Lamar was "completely naked," that his "behavior [was] extremely agitated," and that he "would recommend emergency medication." (*Id.* ¶ 87.) He added that Lamar's medical records from prior detentions showed Lamar "has calmed after emergency injections of thorazine and haldol in the past." (*Id.*) Despite Ragazino's recommendation that Lamar receive "emergency medication," no one provided that care and, instead, continued holding him with "material restrictions." (*Id.* ¶ 88.)

The week Lamar was incarcerated, weather forecasts showed Atlanta would experience extremely cold weather. (*Id.* ¶ 105.) In preparation, jail officials told staff to give two blankets to each inmate in an end-cell unit. (*Id.* ¶ 109.) Lamar should have received those blankets. (*Id.* ¶ 116.) Because he was "on material restrictions," he did not. (*Id.*) The jail also did not have any "suicide safety blankets" for Lamar. (*Id.*

[1] "Material restrictions" appears to be a jail policy that prevents suicide by preventing inmates access to items they could use to hurt themselves (including blankets). (Dkt. 195 ¶¶ 84, 116.)

¶ 117.) So, despite the forecasted extreme temperatures, Lamar remained in an end-cell without clothes or a blanket. (*Id.* ¶¶ 86, 119.)

Over the course of two days and during the extremely cold weather, several nurses and jail staff observed and "checked on" Lamar. (*Id.* ¶¶ 123–142, 151.) They did so only by looking through the cell windows. (*Id.* ¶¶ 138, 142.) On December 26, Lamar became unresponsive to officers' questions. (*Id.* ¶¶ 152–55.)[2] Several officers then entered his cell and learned he had died of hypothermia. (*Id.* ¶¶ 47, 155.)

Plaintiffs sue Defendants for the death of their son, bringing various claims against various Defendants. (Dkt. 1.) Plaintiffs separate Defendants into three buckets: the Centurion Defendants—which includes Centurion, Ragazino, Mendoza and six Centurion nurses (Jessie Alexander, Augustina Anyikwa, Ronsheika Carroll, Beverly Dwyer, Shirley McBride, and Amelia Sanders); the Jail Defendants—which includes 23 detention officers or supervisors who worked at the jail (Anton Baptiste, Shaq Dunnegan, Mufutau Falade, Pamela Fountain, Jasmine Gonzalez, Andrea Grandison, Dingwu Jia, J. Monroe, Orlanda

[2] The complaint says December 26, 2023, but this appears to be a typo.

Mahdi, Kindia Mathis, O. Soyomokokun, A. Thibodeax, Martell Williams, J. Young, D. Bryant, T. Roberts, L. Soares, Shanika Terry, J. Kempf, Erika Hunt, Terrence Graham, K. Benton, and L. Ethridge); and Sheriff Maddox. All Defendants move to dismiss. (Dkts. 198–200.)

## II. Standard of Review

"Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009). A court may dismiss a pleading for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Iqbal*, 556 U.S. at 678. At the stage of a motion to dismiss, "all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1273 n.1 (11th Cir. 1999).

## III. Discussion

Some housekeeping matters.[3] Plaintiffs agree the Court should dismiss all claims against John Doe Defendants 1–10. (Dkt. 202 at 4.) The Court does so. It also grants the Jail Defendants' motion to dismiss all claims against Defendants Mathis and Thibodeax because the complaint contains no allegations of wrongdoing against them. (Dkt. 195 ¶ 122 (simply alleging Mathis and Thibodeax were "assigned to and participated as detention officers and superiors [during] Lamar's detention . . . at the DeKalb County Jail").) The Court also agrees with Plaintiffs that they cannot pursue Counts III and X against Sheriff Maddox (Dkt. 203 at 3, 11) and thus dismisses her from those claims.

The Jail Defendants and the Centurion Defendants argue the complaint remains a shotgun pleading.[4] Centurion Defendants say the

---

[3] The Court notes better drafting by Plaintiffs could have saved Defendants from making—and the Court from considering—unnecessary arguments. Plaintiffs, for example, admit they "inadvertently" included the section 1983 claim against Sheriff Maddox because they "failed to delete her from that count when using the Second Amended Complaint as a template for the Third Amended Complaint." (Dkt. 203 at 4.) Plaintiffs ought to do better next time.

[4] On November 21, 2025, the Court held a hearing with the parties and addressed the shotgun nature of Plaintiffs' prior complaint. (Dkt. 192.)

complaint "is replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action." (Dkt. 198-1 at 15.) But they don't point to the portion of the complaint they contend resembles a shotgun pleading. The Court thus rejects the Centurion Defendants' characterization.[5] The Jail Defendants provide little better argument, saying Plaintiffs don't specify which of the Jail Defendants were responsible for which acts or omissions. (Dkt. 200-1 at 10.) They also argue the complaint does not specify exactly what each Jail Defendant knew about Lamar's confinement and how they obtained that knowledge. (*Id.*) Having reviewed the complaint, the Court concludes Plaintiffs have alleged acts, omissions, and knowledge for *most*

During that hearing, the Court ordered Plaintiffs to file an amended complaint that specifically alleged what each Defendant knew (regarding Lamar, his mental health conditions, and the conditions of his confinement) and how each Defendant came to know those things.

[5] As part of their shotgun pleading argument, the Centurion Defendants contend Plaintiffs "fail[ed] to allege the necessary causation" element of their negligence and wrongful death claims. (Dkt. 198-1 at 16.) The Court does not consider this argument because the Centurion Defendants failed to build it out or cite any supporting authority. *See Singh v. United States Att'y Gen.*, 561 F.3d 1275, 1278–79 (11th Cir. 2009) (explaining a party's statement that an issue exists, "without further argument of discussion, constitutes abandonment of that issue").

Defendants. When they fail to do so, the Court dismisses that Defendant. The Court thus declines to dismiss the complaint as a shotgun pleading.

### A. Centurion Defendants

Plaintiffs assert claims under 42 U.S.C. § 1983 against various Centurion Defendants for subjecting Lamar to unconstitutional conditions of confinement and for being deliberately indifferent to his serious medical needs (Counts I and II)[6], violating the Rehab Act by failing to provide medical treatment for his mental health condition (Count IV)[7], simple negligence for failing to check on him while isolated in the cold cell (Count VI), professional negligence for failing to treat his mental health condition (Count VII), violating his constitutional rights though a pattern or practice of deliberate indifference and a pattern and practice of failure to train in violation of 42 U.S.C. § 1983 (Counts VIII and IX), and wrongful death (Count X). The Centurion Defendants move

---

[6] Plaintiffs reassert Counts I and II against Centurion and Sheriff Maddox in their official capacities (Count III). As discussed above, Sheriff Maddox is dismissed as to Count III.

[7] Another example of Plaintiffs' messy drafting: the complaint appears to assert a claim against Centurion under the Americans with Disabilities Act, but Plaintiffs' response to Centurion's motion to dismiss clarified they assert a Rehab Act claim only. (Dkt. 201 at 15.)

to dismiss all claims based on alleged unconstitutional conditions of confinement, deliberate indifference to Lamar's medical needs, any pattern and practice of deliberate indifference and failure to train, and any violation of the Rehab Act.

### 1. Unconstitutional Conditions Claim

In several different counts, Plaintiffs divide the Centurion Defendants into two further buckets—the Centurion Individual Defendants (making up the Centurion Psychiatric Defendants and the Centurion Nurse Defendants) and Centurion itself. Plaintiffs claim the Centurion Individual Defendants (along with the Jail Defendants) subjected Lamar to a cell that deprived him of his basic human needs, including clothing, bedding, a warm and dry shelter, lighting, social interaction, and mental health care. (Dkt. 195 ¶¶ 162, 164.) They say those conditions violated Lamar's constitutional rights (Count I).

A plaintiff alleging he or she was subject to unconstitutional conditions while in pre-trial detention may bring a section 1983 claim for a violation of his or her Fourteenth Amendment rights. *Ireland v. Prummell*, 53 F.4th 1274, 1287 (11th Cir. 2022). "To prevail on such a claim, a [plaintiff] must satisfy both an objective and a subjective

inquiry." *Id.* (citation omitted). The objective inquiry requires the plaintiff to allege conditions were sufficiently serious to violate the Eighth Amendment, more specifically that "extreme conditions created an unreasonable risk—one that society chooses not to tolerate—of serious damage to the detainee's future health or safety." *Ellis v. Pierce*, 415 F. App'x 215, 217 (11th Cir. 2011) (internal quotations omitted).[8] The subjective inquiry, on the other hand, requires the plaintiff to allege the defendants acted with deliberate indifference. *Id.* This means a plaintiff must allege that, at the time the defendant acted or failed to act, the defendant "was actually, subjectively aware that his [or her] own conduct caused a substantial risk of serious harm to the plaintiff." *Wade v. McDade*, 106 F.4th 1251, 1262 (11th Cir. 2024) (rejecting both the "more

[8] Two things to note. First, the Court recognizes *Ellis* is unpublished and not binding. The Court cites it and other unpublished cases nevertheless as instructive. *See Searcy v. R.J. Reynolds Tobacco Co.*, 902 F.3d 1342, 1355 n.5 (11th Cir. 2018) ("Unpublished cases do not constitute binding authority and may be relied on only to the extent they are persuasive."). Second, the same standard applies to claims alleging a Fourteenth Amendment violation and claims alleging an Eighth Amendment violation. *Goodman v. Kimbrough*, 718 F.3d 1325, 1331 n.1 (11th Cir. 2013)

than mere negligence" or "more than gross negligence" standard for subjective inquiry of deliberate indifference claims).

The Centurion Defendants don't contest Plaintiffs' allegations are sufficient to satisfy the objective component of this claim. They argue, however, that Plaintiffs have not plausibly alleged they "were aware that there was substantial risk of [Lamar] suffering from hypothermia." (Dkt. 198-1 at 7.) Plaintiffs respond by pointing to specific allegations that they say demonstrate each Centurion Defendant's subjective awareness. (Dkt. 201 at 4.)[9]

Plaintiffs have plausibly alleged the subjective component of their conditions of confinement claims as to *most* of the Centurion Nurse Defendants. They allege, for example, that Defendant Dwyer "knew Lamar was naked in a cold cell" and "needed clothing for warmth." (Dkt.

---

[9] Two additional things to note. First, Plaintiffs' response does not distinguish the facts they allege in support of their unconstitutional conditions claim (Count I) versus the facts they allege in support of their deliberate indifference to medical conditions claim (Count II). (Dkt. 201 at 4.) This suggests duplicate claims. The Court does not address that issue because Defendants do not raise it. Second, Plaintiffs point to allegations establishing Defendants' "universal knowledge" of Lamar's conditions (*id.* at 4), but that is exactly the pleading deficiency the Court rejected when it dismissed Plaintiffs' previous complaint as a shotgun pleading. The Court does not consider those generalized allegations.

195 ¶ 137.) They allege that Alexander "routinely wore a jacket on 3A because it was cold," and knew Lamar was housed in that same unit. (*Id.* ¶ 138.) The complaint contains similar allegations for Carroll, McBride, and Sanders, plausibly claiming these Defendants had the chance to personally observe the conditions in which Lamar was being housed (including, by implication, the temperature). (*Id.* ¶¶ 139, 141, 142.)[10] So—according to Plaintiffs—each of these people would have known Lamar was still being housed in the end cell, was still naked, and had no blanket (or even a suicide blanket) during the very cold weather. The Court may additionally "infer the existence of [a] subjective state of mind from the fact that the risk of harm [to someone in those conditions] is obvious." *Hope v. Pelzer*, 536 U.S. 825, 842 (1994). The risk of harm to Lamar here was obvious: he was naked in a jail cell with inadequate

[10] Although the Centurion Defendants contend Plaintiffs' allegations about the cell being cold fail to allege a substantial risk of hypothermia, the Court can reasonably infer the Centurion Defendants knew temperatures in Atlanta were going to be atypically and dangerously low on the days leading up to Lamar's death because they worked in the jail and because they (presumably) lived in or near Atlanta. *See Bailey v. Wheeler*, 843 F.3d 473, 478 n.3 (11th Cir. 2016) ("On a motion to dismiss, the court must . . . draw all reasonable inferences in the plaintiff's favor.").

heating and no blanket during historically cold weather. (Dkt. 195 ¶ 97.) Plaintiffs have thus plausibly alleged Defendants Alexander, Carroll, Dwyer, McBride, and Sanders had the requisite subjective knowledge about the unconstitutional conditions Lamar faced while confined.

The complaint, however, lacks allegations of subjective knowledge as to Anyikwa (the only remaining Centurion Nurse Defendant) or Centurion Psychiatric Defendants (Mendoza and Ragazino). The lone allegation about Defendant Anyikwa is that she "identified that Lamar needed a blanket, yet no blanket was ever provided[.]" (*Id.* ¶ 140.) That doesn't allege Anyikwa knew of Lamar's extreme conditions or that no one had given him a blanket. That's because, unlike Plaintiffs' allegations against the Centurion Defendants identified above, Plaintiffs do not allege Anyikwa ever conducted rounds or personally observed Lamar's cell during the extreme weather. Similarly, the complaint contains no allegations Ragazino or Mendoza knew of the conditions in Lamar's cell or that the jail failed to provide him a suicide blanket.[11]

[11] Plaintiffs allege Ragazino and Mendoza both "personally observed [Lamar's] environment." (Dkt. 195 ¶¶ 14–15.) Putting aside the fact this language appears to be a copy-and-paste job for all Defendants (save for

While Plaintiffs allege both Mendoza and Ragazino had a chance to observe Lamar during his detention (Dkt. 195 ¶¶ 14, 15), they do not allege they ever saw or somehow learned of the conditions in his confinement at the relevant time. Because the complaint lacks allegations that these Centurion Defendants knew of a risk of a serious harm resulting from the conditions of Lamar's confinement, the Court dismisses Plaintiffs' unconstitutional conditions claim as to Anyikwa, Mendoza, and Ragazino.

**2. Deliberate Indifference Claim**

Plaintiffs also claim the Centurion Psychiatric Defendants and Nurse Defendants violated Lamar's constitutional rights when they failed to provide required medical attention to Lamar (Count II). (Dkt. 195 ¶¶ 168–79.) The best the Court can tell, Plaintiffs allege these Defendants violated Lamar's rights in this regard when they failed to provide him proper medication for his mental health problems (thus precluding his stabilization and causing jail officials to house Lamar in the mental health unit of the jail) (*id.* ¶¶ 172–173) and when they failed

Sheriff Maddox), this fact does not sufficiently and specifically allege Ragazino and Mendoza were aware of the conditions of Lamar's cell.

to provide medical attention with the frequency they should have, particularly as "hypothermia set in" (*id.* ¶¶ 175, 177).

A plaintiff bringing a 1983 claim under the Fourteenth Amendment for deliberate indifference to medical needs must allege he or she had an objectively serious medical need, that a government official was deliberately indifferent to that need, and the official's actions caused additional injury. *Ireland*, 53 F.4th at 1287.[12] As with an unconstitutional conditions of confinement claim, a government official acts deliberately indifferent to a plaintiff's medical needs if he or she was actually, subjectively aware that his or her conduct caused a substantial risk of serious harm. *Wade*, 106 F. 4th at 1262.

---

[12] Earlier Eleventh Circuit decisions held that causation is a required element of a claim for failure to provide medical care. *See Mann v. Taser Int'l., Inc.*, 388 F.3d 1291 (11th Cir. 2009) ("To prevail on a deliberate indifference to serious medical need claim, Plaintiffs must show (1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury."); *Goodman*, 718 F.3d at 1331 ("To survive summary judgment in a case alleging deliberate indifference, a plaintiff must produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." (citation omitted)). Centurion Defendants do not argue Plaintiffs failed to allege causation in support of their deliberate indifference claim, so the Court does not address it.

The Centurion Defendants' paragraph-long argument says Plaintiffs' deliberate indifference to medical needs claim fails because they "readily plead that [Lamar] was receiving mental healthcare from the Centurion Defendants." (Dkt. 198-1 at 10.) This, of course, does nothing to address Plaintiffs' allegations that (1) Ragazino and Mendoza both failed to prescribe Lamar any medication that would stabilize him despite knowing Lamar previously responded well to medication (Dkt. 195 ¶¶ 79, 84, 86–87), (2) the Centurion Nurse Defendants repeatedly failed to take Lamar's vitals which could have indicated that his medical condition was deteriorating and might have prompted medical attention (*id.* ¶¶ 137–142), and (3) the Centurion Nurse Defendants failed to intervene when Lamar was housed in a cold cell and/or began to show signs of deterioration (*id*). Plaintiffs' allegations make clear this isn't a case of "poor exercise of medical judgment[,]" as Centurion Defendants suggest. (Dkt. 198-1 at 10.) Instead, Plaintiffs have plausibly alleged the Centurion Defendants failed to provide any meaningful medical treatment to Lamar. So their deliberate indifference to medical treatment claim may proceed. *See Lancaster v. Monroe Cnty.*, 116 F.3d 1419, 1425 (11th Cir. 1997) ("[C]ase law ha[s] made it clear that an

official acts with deliberate indifference when he knows that an inmate is in serious need of medical care, but he fails or refuses to obtain medical treatment for the inmate.”).

### 3. Rehab Act Claim

The Rehab Act makes it unlawful for certain entities to exclude an individual’s participation from or to discriminate against an individual in any program or activity on the basis of his or her disability. *See* 29 U.S.C. § 794(a). An entity is only subject to the Rehab Act if it receives federal financial assistance. *Id.* Citing this requirement, Centurion moves to dismiss Plaintiffs’ Rehab Act claim against it (Count IV), arguing it did not receive federal financial assistance but was a “private medical contractor receiving payment from [DeKalb County] under service contracts rather than directly from federal sources.” (Dkt. 198-1 at 15.) It says the Rehab Act does not apply to private medical contractors like it. (*Id.*)

Good argument (possibly); bad timing. Plaintiffs allege Centurion was “at all relevant times [a] recipient[] of federal funds.” (Dkt. 195 ¶ 191.) At the pleading stage, that is sufficient for their Rehab Act claim to survive Centurion’s attack. *See Fernandez v. Bruno Northfleet, Inc.*,

568 F. Supp. 3d 1294, 1300 (S.D. Fla. 2021) (declining to dismiss a plaintiff's Rehab Act claim where plaintiff alleged that defendant business is a "recipient of federal financial assistance[,]" despite the defendant's contention it did not receive such assistance). Indeed, the Court notes the cases Centurion cites in support of its argument that it received no federal financial assistance involved a determination at summary judgment, when the details of a defendant's financial involvement with the federal government can be examined. *See Jones v. Ala. Power Co.*, 1995 WL 238338, at *19 (N.D. Ala. Jan. 3, 1995) ("Because plaintiff cannot present substantial evidence to show that defendant is a recipient of 'federal financial assistance,' summary judgment is due to be granted on her [Rehab Act] claim."); *Wehby v. Springer Equip. Co.*, 2018 WL 1182607, at *4 (N.D. Ala. Mar. 7, 2018) (granting defendant's motion for summary judgment "because there is no Rule 56 evidence that defendant received federal financial assistance during the time that it employed plaintiff").

### 4. *Monell* Claims

"A plaintiff may sue a municipality directly under § 1983 when one of its policies, customs, or practices causes a constitutional injury."

*Edwards v. Grubbs*, 179 F.4th 909, 929 (11th Cir. 2026) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)).[13] A policy doesn't have to be written or approved through official decision-making channels for liability to attach, but it must be so settled and permanent that it takes on the force of law. *Edwards*, 179 F.4th at 929; *see also Rogers v. City of Atlanta*, 214 F. Supp. 3d 1314, 1317 (N.D. Ga. 2016) (listing various ways in which a plaintiff asserting a *Monell* claim may allege a policy). "To impose *Monell* liability, a plaintiff must show (1) that his constitutional rights were violated, (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right, and (3) that the policy or custom caused the violation." *Underwood v. City of Bessemer*, 11 F.4th 1317, 1333 (11th Cir. 2021) (internal quotation marks and citation omitted).

Plaintiffs bring so-called *Monell* claims against Centurion—alleging it violated Lamar's constitutional rights by

[13] Though a private corporate entity, Centurion does not dispute Plaintiffs may bring *Monell* claims against it. Indeed, because Centurion "contract[ed] with [DeKalb County] to provide medical services to inmates, . . . it [became] the functional equivalent of [a] municipality." *Buckner v. Toro*, 116 F.3d 450, 452 (11th Cir. 1997).

"maintain[ing] a pattern or practice of deliberate indifference to the serious medical needs of inmates housed in the psychiatric unit" (Dkt. 195 ¶ 224 (Count VIII)) and by "fail[ing] to train and supervise its employees on critical aspects of psychiatric care" (Dkt. 195 ¶ 229 (Count IX)).[14]

**a) Practice of Deliberate Indifference**

Apparently conceding Plaintiffs have met the first prong, Centurion argues Plaintiffs failed to allege a pattern or policy of deliberate indifference because Lamar's death—due to hypothermia—was an isolated incident. (Dkt. 198-1 at 11.) It also argues Plaintiffs fail to allege any such pattern or policy caused Lamar's death. (*Id.*) In response, Plaintiffs say other inmates' deaths, Centurion's failure to comply with their contractual agreements, and a low performance score evidences a

---

[14] Count III also appears to be a *Monell* claim asserted against Centurion. (Dkt. 195 ¶¶ 180–189.) Centurion does not separately argue for the dismissal of Count III. Instead, after arguing for the dismissal of Count II against the Psychiatric and Nurse Defendants, Centurion slipped in a request for dismissal of III against it with no additional argument or authority. (Dkt. 198-1 at 10.) Because a party properly makes an argument only when it supports the argument with factual and legal authority, *Singh*, 561 F.3d at 1278–79, the Court does not address Count III as to Centurion.

pattern of systemic failures. (Dkt. 201 at 18–19.) Plaintiffs fail to engage in Centurion's argument that the complaint does not sufficiently allege the causation element.

The Court agrees with Centurion. Plaintiffs fail to allege plausibly a pattern or policy of deliberate indifference. The Court is not sure what to make of Plaintiffs' allegations concerning Centurion's dissatisfactory "Vendor Performance Score" and failure to comply with an audit and contractual obligations because Plaintiffs do not explain—in either their complaint or their response opposing dismissal—what the Vendor Performance Score is supposed to measure or how the audit is significant. Nor do Plaintiffs cite any authority suggesting the Court may look to such criterion in assessing deliberate indifference claims. Absent such important details, the Court concludes these allegations are insufficient to allege Centurion had a pattern or practice of deliberate indifference to the serious medical needs of inmates housed in the psychiatric unit.

Plaintiffs' allegation of frequent inmate deaths could possibly support their claim that Centurion had a pattern or practice of deliberate indifference to medical needs. *See Heath v. Miami-Dade Cnty.*, 736 F. Supp. 3d 1149, 1160 (S.D. Fla. 2024) (finding allegation of three inmate

suicides at county jail, coupled with other allegations, allowed the court to reasonably infer defendant had custom of permitting deliberate indifference to inmates' serious mental health needs). But Plaintiffs admit those other inmates died by suicide, and Plaintiffs include no allegation that Centurion acted deliberately indifferent to their medical needs. In fact, they fail to allege the other inmates were even under Centurion's care. Without some allegation that Centurion's deliberate indifference caused those deaths, Plaintiffs merely allege "[a] single incident of a constitutional violation [which] is insufficient to prove a policy or custom." *Craig v. Floyd County, Ga*, 643 F.3d 1306, 1311 (11th Cir. 2011).

The Court accordingly dismisses Plaintiffs' practice-of-deliberate-indifference *Monell* claim against Centurion.

**b) Failure to Train**

In limited circumstances, a plaintiff may base a *Monell* claim on a municipality's failure to adequately train or supervise its employees. *City of Canton v. Harris*, 489 U.S. 378, 387 (1989). A municipality may be liable for its failure to train if (1) it knew of a need to provide its employees training in a specific area, (2) it made a deliberate choice not

to provide that training, and (3) its deliberate choice caused the deprivation of a plaintiff's constitutional rights. *Yancey v. Tillman*, 696 F. Supp. 3d 1310, 1325 (N.D. Ga. 2023); *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998). A plaintiff bringing a failure-to-train *Monell* claim must also allege the municipal defendant acted with deliberate indifference to the need for training. *Connick v. Thompson*, 563 U.S. 51, 61 (2011). This requires plausible allegations that the municipal defendant failed to provide training despite actual or constructive notice that its failure to do so would result in constitutional violations. *Id.* To do so, a plaintiff typically alleges "[a] pattern of similar constitutional violations by untrained employees[.]" *Yancey*, 696 F. Supp. 3d at 1325. A plaintiff may alternatively establish deliberate indifference by alleging the need for training is "so obvious" that a violation of federal rights is a "highly predictable consequence" of the failure to provide such training. *Gold*, 151 F.3d at 1352.

Plaintiffs allege Centurion is liable for violating Lamar's constitutional rights because it "failed to train and supervise its employees on critical aspects of psychiatric care" and that the failure to do so "was virtually certain to result in constitutional violations." (Dkt.

195 ¶ 230.) By way of greater explanation, Plaintiffs allege Centurion failed to provide training on hypothermia recognition and response, escalation protocols, psychiatric supervision assessment, and environmental safety (including how to protect patients from cold weather). (*Id.* ¶ 231(a)–(d).) They allege the need for this training was "obvious" because inmates "experiencing psychotic episodes may engage in self-harming behaviors, refuse food and water, strip naked, and become unresponsive, all symptoms Lamar exhibited." (*Id.* ¶ 230.)

Centurion says Plaintiffs' failure-to-train claim fails because they fail to allege Centurion knew of a need to train its employees specifically about hypothermia—the condition that caused Lamar's death. (Dkt. 198-1 at 12.) In response, Plaintiffs say they sufficiently alleged deliberate indifference because the complaint alleges the need for training was obvious. (Dkt. 201 at 20.) In support of this, they merely cite their allegation that Centurion failed to provide training on escalation protocols, environmental safety, and the supervision of psychiatric assessments. (*Id.* at 20–21.) Plaintiffs also cite their complaint's allegation that "Centurion's failure to train was the moving force behind Lamar's death." (*Id.* at 21 (citing Dkt. 195 ¶ 232).)

Plaintiffs have not plausibly alleged Centurion knew of the need to provide the specific training Plaintiffs identify, that it made a deliberate choice not to provide the training, or that it did so with deliberate indifference. Most importantly, Plaintiffs' allegation that the need for training was "obvious" because Centurion's "failure to train staff on recognizing and responding to [an inmate's] psychotic episodes . . . was virtually certain to result in constitutional violations" (Dkt. 195 ¶ 230), is too conclusory. It does not explain why or how constitutional violations—like the one that allegedly occurred here—were a highly probable consequence of Centurion's failure to provide training on psychotic episodes, escalation protocols, environmental safety, or hypothermia. *See Davis v. City of Montgomery*, 220 F. Supp. 3d 1275, 1284 (N.D. Ala. 2016) (dismissing *Monell* claim because plaintiff's allegation that "it was highly predictable that failure to train Police Officers to deal with such disabled citizens would result in violations of their federal rights" was conclusory).

Take Plaintiffs' allegation about hypothermia. Plaintiffs allege "Nurse Alexander testified that Centurion provided no training on recognizing or treating hypothermia[.]" (Dkt. 195 ¶ 231(a).) This

allegation does not allege Centurion knew of a need for such training. And Plaintiffs don't allege that anywhere else. Nothing suggests that—before Lamar's death—Centurion knew inmates might experience hypothermia while in the jail or that its employees could not recognize someone in that condition. The same is true for each of the other alleged training failures Plaintiffs identify; there are no allegations Centurion was aware it provided inadequate training in these areas.

Perhaps recognizing the foregoing, Plaintiffs insist this case "is precisely the type of 'single incident exception' [the Supreme Court] recognized in [*Canton* v. *Harris*]: where employees will inevitably face situations requiring specific training, and the consequences of inadequate training are predictable, the failure to train can support *Monell* liability even without a pattern of prior violations." (Dkt. 201 at 20–21.) *Canton*, however, generally rejects the idea that a single incident can establish a failure-to-train claim. 489 U.S. at 399 (O'Connor, J., concurring) ("Allowing an inadequate training claim such as this one to go to the jury based upon a single incident would only invite jury nullification of *Monell*."). But the Supreme Court explained that sometimes the "need for more or different training is so obvious, and the

inadequacy so likely to result in the violation of constitutional right" that *Monell* liability arises in the first instance. *Id.* at 390. It described that as a situation in which officials know "to a moral certainty" that a constitutional violation will definitely occur without additional training—like the need to provide use-of-force training when giving officers guns to use while arresting fleeing suspects. *Id.* at 390 n.10. This is not that case. Plaintiffs have not plausibly alleged Centurion knew "to a moral certainty" that its training was inadequate to address the situation that arose during the extreme cold weather event.

The Court accordingly dismisses Plaintiffs' failure-to-train *Monell* claim against Centurion.

**B. Jail Defendants**

Plaintiffs assert claims under 42 U.S.C. § 1983 against the individual Jail Defendants for subjecting Lamar to unconstitutional conditions of confinement and for being deliberately indifferent to his serious medical needs (Counts I and II), simple negligence for failing to provide Lamar blankets or another way to keep warm (Count V), and wrongful death (Count X).

### 1. Qualified Immunity

The Jail Defendants argue they are entitled to qualified immunity on Plaintiffs' 1983 claims. (Dkt. 200-1 at 12–13.) "Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002). When properly applied, qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).

Qualified immunity may attach only when the officer is "acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Grider v. City of Auburn*, 618 F.3d 1240, 1254 n.19 (11th Cir. 2010). Because the parties do not dispute the Jail Defendants were acting within their discretionary authority while on shift during the days leading up to Lamar's death, "the burden shifts to [Plaintiffs] to show that qualified immunity is not appropriate." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2022); *see also GJR Inv., Inc. v. Cnty. of Escambia*, 132 F.3d 1359, 1366 (11th Cir. 1998) (recognizing a

court may inquire into qualified immunity on a Rule 12(b)(6) motion). The qualified immunity analysis presents two questions: whether the allegations, taken as true, establish the violation of a constitutional right and, if so, whether the constitutional right was clearly established when the violation occurred. *Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008).

**a) Unconstitutional Conditions Claim**

**(1) Fourteenth Amendment Violation**

The Jail Defendants argue Plaintiffs' allegations regarding the conditions of Lamar's confinement fail plausibly to allege the objective prong—that is, that the conditions Lamar faced in his cell threatened his life to a degree that society would not tolerate. *Ellis*, 415 F. App'x at 217. They say Plaintiffs' allegations are insufficient because they fail to allege details like "the precise temperature" in the cell or "how long" the Jail Defendant left him exposed to those conditions. (Dkt. 200-1 at 14.) They say the complaint "at most describes unpleasant, and arguably negligent, conditions" but nothing that rises to the level of an Eighth Amendment violation. (*Id.*) They also attack Plaintiffs' subjective allegations, arguing they "do not plausibly allege that any [Jail Defendant] acted with

the requisite state of mind." (*Id.* at 15.) Plaintiffs do not respond to the Jail Defendants' attack on their objective allegations, only insisting they "amply allege that the Jail Defendants knew about Lamar's environment, condition, and need for attention." (Dkt. 202 at 8.)[15]

Despite Plaintiffs' non-responsiveness, the Court rejects the Jail Defendants' attack on the objective prong of Plaintiffs' conditions of confinement claim. Plaintiffs have cleared the "high bar by demonstrating [Lamar was subject to] *extreme* deprivations." *Ellis*, 415 F. App'x at 217 (emphasis in original). Plaintiffs allege that—during a time of historically cold weather—these Defendants housed Lamar in one of the jail's coldest cells without clothing, a blanket, or other adequate heating. (Dkt. 195 ¶¶ 77, 105, 109.) And he had no working button to call for help. (*Id.* ¶ 97.) The cell was so cold it caused him to die of hypothermia. A cell so cold it freezes someone to death certainly poses an objectively unreasonable risk and one that society would not tolerate.

---

[15] Plaintiffs' messy drafting is exemplified—again—in their response to the Jail Defendants' motion to dismiss. Plaintiffs first say their amended complaint drops their claims against Bush and Onuoho (Dkt. 202 at 3), but, a few pages later, Plaintiffs argue they have provided sufficient details as to Bush and Onuoho's specific wrongdoing (*id.* at 10–11).

As to the subjective component, Plaintiffs sufficiently allege some of the Jail Defendants knew of the serious risk Lamar faced in the cell and recklessly failed to act. The complaint contains detailed factual allegations that Defendants Fountain, Gonzalez, Grandison, Jia, Soyomokokun, and Williams saw Lamar and the conditions of his cell and should have been able to recognize the serious harm he faced in those conditions. (Dkt. 195 ¶¶ 123–124, 126, 147, 153–155.) Plaintiffs allege, for example, that Williams saw Lamar the day before and the day of his death. (*Id.* ¶ 127.) He saw Lamar "naked, without bedding, in a dark, cold cell with a broken light." (*Id.*) He "admitted he was 'concerned' for Lamar's safety, acknowledged clothing and a heated cell are 'life necessities,' and confirmed he had discussed his concerns about Lamar's safety with nurses on prior days." (*Id.*) Similarly, Plaintiffs allege Gonzalez knew there was no heat in Lamar's cell, knew of the need to provide inmates blankets "due to dangerously cold conditions," and knew Lamar had no clothing or blanket. (*Id.* ¶ 124.)

Plaintiffs, however, include no plausible allegations that Defendants Terry, Kempf, Graham, Roberts, Bryant, Benton, Young, Soares, Ethridge, Hunt, Monroe, Mahdi, Falade, Dunnegan, and Baptiste

knew of the dangerous conditions in Lamar's cell. The complaint merely alleges these Defendants conducted toilet flushes or received the email requiring distribution of additional blankets to inmates and were obligated to make sure blankets were distributed. (*Id.* ¶¶ 111, 133, 148.) The Court dismisses Count I as to these fifteen Defendants.

**(2) "Clearly Established Law"**

A constitutional right is clearly established for qualified immunity purposes only if "every reasonable official would have understood that what he [or she was] doing violates that right." *Ruch v. McKenzie*, 2019 WL 1407012, at *4 (N.D. Ga. Mar. 28, 2019) (citing *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). Put differently, "existing precedent must have placed the statutory or constitutional question beyond debate" to give the official fair warning that his or her conduct violated the law. *Id.* (citing *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011)).

A plaintiff typically shows a defendant's conduct violated clearly established law by pointing to "materially similar precedent from the Supreme Court, [the Eleventh Circuit], or the highest state court in which the case arose." *Id.* at *5. While the facts of the case need not be identical, "the unlawfulness of the conduct must be apparent from

pre-existing law." *Coffin*, 642 F.3d at 1013. Fair warning can also arise from two other sources. First, "[a]uthoritative judicial decisions may 'establish broad principles of law' that are clearly applicable to the conduct at issue." *Gates v. Khokar*, 884 F.3d 1290, 1296 (11th Cir. 2018). Second, "it may be obvious from 'explicit statutory or constitutional statements' that conduct is unconstitutional." *Id.* Regardless of the method, the preexisting law must "make it obvious that the defendant's acts violated the plaintiff's rights in the specific set of circumstances at issue." *Youmans v. Gagnon*, 626 F.3d 557, 563 (11th Cir. 2010).

The Jail Defendants argue there was "[n]o controlling precedent . . . clearly establish[ing] that [they] violated [Lamar's] constitutional rights." (Dkt. 200-1 at 18.) Plaintiffs say at least one case, *Chandler v. Baird*, establishes an inmate's right not to be housed in extremely cold jail cells. (Dkt. 202 at 8.) The Court agrees with Plaintiffs.

In *Baird*, the plaintiff alleged he was confined "in a cold cell with no clothes except undershorts and with a plastic-covered mattress without bedding[.]" 926 F.2d 1057, 1063 (11th Cir. 1991). Citing other cases, the Eleventh Circuit concluded a prisoner had a right "not to be confined in a cell at so low a temperature to cause severe discomfort." *Id.*

at 1066. The Eleventh Circuit in *Crosby* acknowledged the *Baird* court "did not have the benefit of the Supreme Court's rulings" in later cases that "clearly delineated the objective and subjective components of Eighth Amendment claims" and thus rejected the "severe discomfort" standard. *Chandler v. Crosby*, 379 F.3d 1278, 1296 (11th Cir. 2004).[16] While that may be true, that doesn't change the Eleventh Circuit's statement in *Crosby* that extreme temperatures in a jail cell could constitute an Eighth Amendment violation if they are "unconstitutionally excessive." *Crosby*, 379 F.3d at 1297. *Id.* And the Eleventh Circuit in *Crosby* continued to acknowledge that a jail violates an inmate's constitutional rights when it exposes him or her to temperatures that present an unreasonable risk of serious damage to the inmate's health. *Id.* Temperatures that threaten an inmate's life plainly violate that inmate's constitutional rights.

And Plaintiffs don't simply allege the Jail Defendants exposed Lamar to "uncomfortable" conditions. They allege they exposed him to deadly conditions, specifically that temperatures in Lamar's cell were

---

[16] And, as discussed above, the Court finds the objective and subjective prongs of Plaintiffs' unconstitutional conditions claim are satisfied.

"extremely cold" and "were too cold for living quarters" such that they caused his death. (Dkt. 195 ¶¶ 113, 145.) At the time leading up to Lamar's death, there was clearly established law that extreme temperatures in a jail cell violate an inmate's constitutional right. *Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (noting "a low cell temperature at night combined with a failure to issue blankets" may establish an Eighth Amendment violation); *Baird*, 926 F.2d at 1066 (acknowledging an inmate has an Eighth Amendment right to be free from low temperatures); *Wallace v. Hamrick*, 229 F. App'x 827, 832 (11th Cir. 2007) (recognizing a plaintiff's allegation that a jail cell had no ventilation was sufficient to survive dismissal of claim of Eighth Amendment violation). Again, this case is considerably worse than those because Plaintiffs allege the Jail Defendants knew the temperature in Lamar's cell were not merely uncomfortable but would include a "freezing spell" that created "the danger of hypothermia to the detainees" such that additional blankets had to be provided. (Dkt. 195 ¶¶ 112–13.)

The Jail Defendants' argument that there is no case "particularized to the facts of this case" is unavailing because "judicial precedent with materially identical facts is not essential for the law to be clearly

established." *Youmans*, 626 F.3d at 563. At the time, it was clearly established that leaving inmates exposed to temperatures so cold that prisoners could freeze to death was unconstitutional. Indeed, it was so obvious the jail said Lamar should be given two blankets to protect him from the cold. Plaintiffs' unconstitutional conditions claim may proceed against the Jail Defendants Fountain, Gonzalez, Grandison, Jia, Soyomokokun, and Williams.

**b) Deliberate Indifference Claim**

**(1) Fourteenth Amendment Violation**

As stated above, Plaintiffs proceed with their claim of deliberate indifference to Lamar's medical needs under two theories: failure to provide Lamar medical attention to treat his mental health crises (thus precluding his stabilization and requiring him to be housed in the mental health unit) (*id.* ¶¶ 172–173) and failure to provide medical attention with the frequency they should have and as Lamar's "hypothermia set in" (*id.* ¶¶ 175, 177). The Jail Defendants do not argue for dismissal based on Plaintiffs' different theories but argue this claim fails because the complaint does not allege Lamar exhibited signs of hypothermia for them to notice. (Dkt. 200-1 at 17.) They also say Plaintiffs' allegations

that medical professionals observed Lamar throughout his detention "undercut Plaintiffs' claims that the Jail Defendants acted with deliberate indifference," making any failure on their part to intervene merely negligent. (*Id.*)

As to Plaintiffs' deliberate indifference involving the failure to provide mental health treatment, Plaintiffs' general allegation that the "[Jail Defendants] . . . knew that Lamar's mental health crisis required substantial attention" does not satisfy a plaintiff's requirement to plead what "each defendant actually knew[.]" *Dellano v. Biem,* 2026 WL 2194692, at *6 (S.D. Fla. July 30, 2026) (citing *Wade v. McDade*, 106 F.4th 1251, 1262 (11th Cir. 2024)).[17] Plaintiffs were warned of their group pleading issue during the status conference and failed to remedy this issue in their amended complaint. Dismissal of this claim is thus proper. *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1296 (11th Cir. 2018) (affirming district court's dismissal of claims where plaintiff was given a chance to fix shotgun pleading issues and failed to do so in

[17] Because the Jail Defendants argue for the dismissal of Count II against them in its entirety, the Court considers whether the complaint contains sufficient allegations as to both theories.

amended complaint). Plaintiffs' deliberate indifference claim under the theory the Jail Defendants failed to address and treat Lamar's mental health crisis may not proceed.

On the other hand, Plaintiffs have adequately alleged certain Jail Defendants failed to protect Lamar during his detention, including by not addressing his hypothermia. Plaintiffs allege a few days into Lamar's confinement, Jia and Sanders (a Centurion Nurse Defendant) expressed concerns about Lamar's health to Williams—that Lamar was laying down on his back, naked and unresponsive. (Dkt. 195 ¶ 153.) Williams asked Lamar if he wanted dinner and to come to the door, but Lamar did not respond. (*Id.* ¶ 153–54.) Despite that, neither Williams nor Jia entered Lamar's cell. (*Id.*) The complaint contains many similar allegations that Defendants Fountain, Gonzalez, and Soyomokokun knew Lamar needed medical attention because of his conditions but failed to provide it. Count II, proceeding under the theory that certain Defendants were deliberately indifferent by failing to address Lamar's hypothermia, remains as to Defendants Jia, Fountain, Gonzalez, and Soyomokokun.

The complaint contains no similar allegations as to Jail Defendants Terry, Kempf, Graham, Roberts, Bryant, Benton, Young, Soares, Ethridge, Hunt, Monroe, Mahdi, Falade, Grandison, Dunnegan, and Baptiste. The single allegation that Mahdi, Monroe, and Falade conducted toilet flushes on December 25, for example, does not plausibly allege those Defendants had subjective knowledge of Lamar's medical conditions and/or symptoms. The Court dismisses Count II as to these sixteen Defendants.

**(2) "Clearly Established Law"**

Again, the Jail Defendants argue "there is no controlling precedent particularized to the facts of this case that clearly establishes that the Jail Defendants' actions or inactions . . . clearly violated [Lamar's] constitutional rights." (Dkt. 200-1 at 19.) The law was clearly established at the time that jail staff may not delay an inmate's medical treatment if injuries are sufficiently serious. *See Youmans*, 626 F.3d at 564 ("[S]hort[] delays [in obtaining medical attention] may also constitute a constitutional violation if injuries are sufficiently serious"); *Lancaster*, 116 F.3d at 1425 (noting that at time of plaintiff's arrest in 1995, "it was clearly established that a jail official violates a pre-trial detainee's

Fourteenth Amendment right . . . when he knows that an inmate is in serious need of medical care, but he fails or refuses to obtain medical treatment for the inmate."). The Jail Defendants delayed medical treatment to Lamar by failing to enter his cell despite observing his unresponsiveness and drastic change in demeanor after being confined naked in an extremely cold cell without the blankets they knew he should have received. Jail Defendants Fountain, Gonzalez, Jia, Williams and Soyomokokun are not entitled to qualified immunity on the portion of Count II alleging the failure to provide medical care while Lamar froze to death.

**2. Official Immunity as to Plaintiffs' State-Law Claims**

Plaintiffs bring state-law claims of negligence and wrongful death against the Jail Defendants (Counts V and X). Their negligence claim is based on two theories: (1) the Jail Defendants' failure to distribute blankets in accordance with a major's email directing them to do so, and (2) the Jail Defendants' failure to maintain the heat at a normal room temperature. (Dkt. 195 ¶¶ 203–208.)

"Under Georgia law, county law enforcement officers are entitled to official immunity from suit . . . unless they negligently perform a

ministerial act or act with malice or an intent to injure when performing a discretionary act." *Speight v. Griggs*, 579 F. App'x 757, 759 (11th Cir. 2014) (citing *Roper v. Greenway*, 751 S.E.2d 351, 352 (Ga. 2013)). An act is ministerial when it is "simple, absolute, and definite . . . and require[s] merely the execution of a specific duty." *Grammens v. Dollar*, 697 S.E.2d 775, 777 (Ga. 2010). On the other hand, an act is discretionary when it "calls for the exercise of personal deliberation and judgment." *Id.*

The parties dispute whether handing out blankets was a ministerial act. (Dkts. 200-1 at 19–23; 202 at 13–18.) The Jail Defendants say the major's email "lack[ed] the clarity and specificity required to impose a ministerial obligation." (Dkt 200-1 at 22.) As to the maintenance of heat, the Jail Defendants say "Plaintiffs do not allege any Defendant had the ability or authority to control the thermostat inside the [jail]." (*Id.* at 23.)

The Court is unpersuaded by the Jail Defendants' arguments. The major's email directed jail staff to "ensure that the inmates located in the end cells . . . are given two blankets." (Dkt. 195-1.)[18] That's nothing if

[18] While a court's review is typically limited to the four corners of a plaintiff's complaint on a motion to dismiss, *St. George v. Pinellas Cnty.*,

not "clear, definite, and certain in directing [the Jail Defendants'] actions[.]" *Barnett v. Caldwell*, 809 S.E.2d 813, 849 (Ga. 2018). The email does not "call for the exercise of [anyone's] personal deliberation and judgment" in handing out blankets, so the Court rejects the Jail Defendants' argument that this was a discretionary duty. *Murphy v. Bajjani*, 647 S.E.2d 54, 57 (Ga. 2007).[19] It was a simple, ministerial act—give these people blankets.[20]

---

285 F.3d 1334, 1337 (11th Cir. 2002), the email is attached to Plaintiffs' complaint, so the Court may consider it. *MSP Recovery Claims, Series LLC v. Metro. Gen. Ins. Co.*, 40 F.4th 1295, 1303 (11th Cir. 2022) ("The Civil Rules of Procedure provide that an attachment to a complaint generally becomes part of the pleading for all purposes, including for ruling on a motion to dismiss." (citation modified)).

[19] The Jail Defendants also argue providing blankets was a discretionary act because it conflicted with the directive that Lamar be placed on "material restrictions" given his mental health status. But the Jail Defendants cite no authority holding a ministerial duty becomes a discretionary one if it conflicts with another policy or directive, so the Court—at this point—rejects this argument. The direction was to give blankets. For Lamar that likely meant a suicide-proof blanket, but a blanket nonetheless. Whether a suicide-proof blanket was available may be relevant in assessing the Jail Defendants' negligence, but it does not change whether the act was discretionary or ministerial.

[20] The Court is also unpersuaded by the Jail Defendants' argument that Plaintiffs' claim fails because they do not allege "specific detention officers received [the] information [to hand out blankets]." (Dkt. 200-1 at 21.) True, the major sent the email to jail captains and lieutenants and

The Jail Defendants argue the Court should dismiss Plaintiffs' negligence claim based on their failure to maintain the heat in Lamar's cell because Plaintiffs have not alleged any Jail Defendant had the ability or authority to control the thermostat. (Dkt. 200-1 at 23.) Plaintiffs' allegation that the Jail Defendants failed to maintain the room temperature allows the Court to make the reasonable inference that the Jail Defendants could, in one way or another, change the temperature in Lamar's cell. (Dkt. 195 ¶ 207.) Additionally, Plaintiffs' allegation that the jail had a policy that the cells were to be maintained at a certain temperature (*id.* ¶ 206) supports the survival of this claim, at least for now. *Cf. Brown v. Taylor*, 596 S.E.2d 403, 405 (Ga. Ct. App. 2004) (suggesting if plaintiff had come forward with evidence "reveal[ing] that there was [a] formal or written policy" about the county's road maintenance, her negligence claim would have survived). It's also plausible the Jail Defendants could have failed to maintain the heat in

---

not necessarily all the jail officers. (Dkt. 195-1.) But other allegations in the complaint—including allegations that a pre-shift jail staff meeting occurred daily—create the reasonable inference the supervisors notified all jail officers of this duty. (Dkt. 195 ¶¶ 109–112, 115, 124.) The remaining Jail Defendants may examine this individualized issue at summary judgment.

Lamar's cell by failing to move him to a different, non-end-unit cell. (Dkt. 195 ¶¶ 101, 119.) An argument based on the Jail Defendants' inability to control the temperature of Lamar's cell is one appropriate for summary judgment, but not at the pleading stage.

### C. Sheriff Maddox

#### 1. ADA

Plaintiffs allege Sheriff Maddox in her official capacity violated the Americans with Disabilities Act ("ADA") by intentionally discriminating against Lamar on account of his mental disability when the jail failed to provide necessary medical care and thus failed to accommodate his mental illness (Count IV). Title II of the Americans with Disabilities Act prohibits agencies of state or local government from discriminating against an individual with a disability. *See* 42 U.S.C. § 12132. To bring such a claim, Plaintiffs must plausibly allege Lamar had a disability and that Sheriff Maddox denied him benefits, services, or programs "by reason of [Lamar's] disability." *Id.* But since Plaintiffs seek monetary damages, they must also allege that Sheriff Maddox "engaged in intentional discrimination, which requires a showing of 'deliberate indifference.'" *Silberman v. Miami Dade Transit*, 927 F.3d 1123, 1134

(11th Cir. 2019) (quoting *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 348 (11th Cir. 2012)). This requires Plaintiffs to allege plausibly that Sheriff Madox "had actual knowledge of discrimination in the entity's programs and failed to adequately respond." *Id.* (citations omitted and modified).

Sheriff Maddox says the complaint fails to allege she had actual knowledge of Lamar's mental health, the conditions of his cell, or the risks he faced while detained at the jail. (Dkt. 199-1 at 7–12.) Plaintiffs insist their allegations, including allegations Sheriff Maddox received various reports, establish her knowledge of discrimination in the jail against those with mental illness. (Dkt. 203 at 5–11.)

Plaintiffs' allegations don't plausibly establish Sheriff Maddox's knowledge. First, Plaintiffs point to the fact Centurion received a Vendor Performance Score of "severely below expectation" for mental health services in February 2023. (Dkt. 195 ¶ 69.) To the extent that could suggest discrimination in the jail's programs in December 2022, Plaintiffs do not allege Sheriff Maddox knew of or received the score. Second, the complaint alleges Sheriff Maddox failed to make any policy changes following the death of nine inmates in 2022. (*Id.* ¶¶ 46, 51.) The

complaint critically fails to allege those deaths arose from any discrimination against inmates with disabilities. Plaintiffs' allegation that four of those people were under psychiatric care or housed in the mental health unit (*id.* ¶ 47), does not plausibly allege any subpar mental health treatment (let alone discrimination). Similarly, Plaintiffs' allegations that Sheriff Maddox "was aware the jail is an old building requiring lots of maintenance" (Dkt. 195 ¶ 98) does not plausibly allege her knowledge of the jail's discrimination against detainees with disabilities.

Finally, Plaintiffs plausibly allege that, both before and after Lamar's death, Sheriff Maddox knew Centurion was not providing the medical staff it agreed to provide, and that she waived penalties Centurion should have paid because of those staffing shortages. (Dkt. 195 ¶ 61–67.) That's close; evidence Sheriff Maddox failed to respond to a known shortage of mental health treatment resources could constitute intentional discrimination. *See England v. Clayton Cnty.*, 2025 WL 4058244, at *7 (N.D. Ga. Sept. 19, 2025) (allowing ADA claim against county sheriff to survive dismissal because sheriff's "lack of response to the treatment of mental health detainees" could constitute intentional

discrimination). But Plaintiffs do not close the loop by alleging Sheriff Maddox knew Centurion's staffing problems implicated the jail's ability to provide adequate mental health treatment. In other words, nothing suggests Sheriff Maddox's apparent decision to allow Centurion to short-staff the jail meant inmates would not receive adequate mental health treatment. *See Est. of Tilson v. Rockdale Cnty.*, 2021 WL 913937, at *4 (N.D. Ga. Mar. 10, 2021) (dismissing a plaintiff's ADA claim where plaintiff failed "to provide the connecting facts to plausibly show that [an inmate] was treated differently" due to his disability). The Court thus dismisses Plaintiffs' ADA claim against Sheriff Maddox.

### 2. Wrongful Death

Plaintiffs concede Sheriff Maddox is entitled to sovereign immunity in regards to their wrongful death claim. (Dkt. 203 at 11.) The Court thus dismisses this claim as to Sheriff Maddox.

## IV. Conclusion

The Court **GRANTS IN PART** and **DENIES IN PART** the Centurion Defendants' Motion to Dismiss (Dkt. 198). Specifically, the Court **DISMISSES** Plaintiffs' unconstitutional conditions of detention claim (Count I) against Defendants Mendoza, Ragazino, and Anyikwa,

Plaintiffs' deliberate indifference to serious medical needs *Monell* claim (Count VIII) against Centurion, and failure to train and supervise *Monell* claim (Count IX) against Centurion. The Court **GRANTS IN PART** and **DENIES IN PART** the Jail Defendants' Motion to Dismiss (Dkt. 200). Specifically, the Court **DISMISSES** Defendants Thibodeax, Mathis, and John Does 1–10 from this action and **DIRECTS** the Clerk to terminate those Defendants from this action. The Court also **DISMISSES** Plaintiffs' unconstitutional conditions of detention claim (Count I) against Defendants Terry, Kempf, Graham, Roberts, Bryant, Benton, Young, Soares, Ethridge, Hunt, Monroe, Mahdi, Falade, Dunnegan, and Baptiste, Plaintiffs' claim of deliberate indifference as to serious medical needs (Count II) under their theory that the Jail Defendants failed to provide medical attention for Lamar's mental health crisis, and Plaintiffs' claim of deliberate indifference (Count II) against Defendants Terry, Kempf, Graham, Roberts, Bryant, Benton, Young, Soares, Ethridge, Hunt, Monroe, Mahdi, Falade, Grandison, Dunnegan, and Baptiste. The Court **GRANTS** Sheriff Maddox's Motion to Dismiss (Dkt. 199) and **DIRECTS** the Clerk to terminate Sheriff Maddox from this action.

For the sake of clarity, Plaintiffs' remaining counts (and the remaining Defendants as to each) are delineated in the chart below.

| | |
|---|---|
| Count I (Unconstitutional Conditions) | Alexander, Carroll, Dwyer, McBride, Sanders, Fountain, Gonzalez, Grandison, Jia, Soyomokokun, and Williams |
| Count II (Deliberate Indifference to Serious Medical Needs) | Mendoza, Ragazino, Alexander, Anyikwa, Carroll, Dwyer, McBride, Sanders, Fountain, Gonzalez, Jia, Soyomokokun, and Williams |
| Count III (*Monell*) | Centurion |
| Count IV (Rehab Act) | Centurion |
| Count V (Simple Negligence) | Jail Defendants |
| Count VI (Simple Negligence) | Centurion, Alexander, Anyikwa, Carroll, Dwyer, McBride, and Sanders |
| Count VII (Professional Negligence) | Centurion Defendants |
| Count X (Wrongful Death) | Jail Defendants<br>Centurion Defendants |

**SO ORDERED** this 28th day of September, 2026.

MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE